#### EXCHANGE BANKING AND TRUST CO. v. FINLEY.

Parent and Child—Guardian—Executor.—A judgment in divorce giving a child to the mother absolves the father from all *legal* obligation to maintain the child, yet he still remains under *moral* obligation to render it assistance, and where the father received as executor a legacy for such child, payments made by him to her to relieve her necessities, under the facts here, are held to have been made in discharge of this *moral* obligation, and he is required to account for the legacy without credit for such payments.

Before Memminger, J., Charleston, May, 1905. Affirmed.

Action by Exchange Banking and Trust Co., as guardian and guardian *ad litem* of Minnie J. Finley, against Edward Finley *et al.* From circuit decree, defendant Edward Finley appeals.

*Messrs. Mitchell & Smith,* for appellant, cite: *Rule as to payments for necessaries:* 35 S. C., 521; 31 S. C., 604; 6 Rich., 26; 15 Ency., 2 ed., 100; 16 *Ibid.*, 278. *Relationship between parties:* Harp. Eq., 179. *Executor's right of set off:* 37 S. C., 123; 44 S. C., 95. *Executor not guardian:* Rice Eq., 238; 20 S. C., 242. *Was payment a gratuity:* 2 McC. Ch., 43; 2 Strob. Eq., 31; 4 Rich., 5; 5 Rich. Eq., 31; 1 S. C., 337.

*Messrs. B. A. Hagood* and *Legare Walker,* contra, cite: *As to now being allowed by Court to set off payments against legacy:* 2 Strob. Eq., 40; 44 S. C., 166; 31 S. C., 413; 2 Story Eq., sec. 1311; 2 McC. Ch., 43, 207; 1 Spear Eq., 29; 7 Rich., 105; Bail. Eq., 279; 6 Ves., 424. *Payments were a gratuity and cannot now be made a charge:* 4 Rich., 5; 2 Strob. Eq., 167; 2 McC. Ch., 43; 5 Rich. Eq., 51; 1 S. C., 337. *Whether appellant held as guardian or trustee can make no difference:* Rice Eq., 238; 31 S. C., 413; 15 Ency., 94; Schouler's Dom. Rel., 474.

March 7, 1906. The opinion of the Court was delivered by

Mr. Justice Gary. The question presented by this appeal is whether a father who, as executor, had in his hands a legacy bequeathed to his infant daughter, has the right to set up as a counter-claim sums expended for her maintenance, when sued by her to recover said legacy, on the ground that he had been previously absolved from legal liability to support his daughter. The facts out of which the controversy arose are thus stated in the decree of his Honor, the Circuit Judge:

"Thomas Finley, late of Charleston, died in 1892, leaving an estate of about $29,000. He had executed a will, whereby his brother, Edward Finley, was appointed executor, and wherein a legacy of $1,000 was bequeathed to Minnie J. Finley (daughter of Edward Finley), then a very young child and now about nineteten years of age. This legacy was to be paid fifteen months after testator's death, without interest until the expiration of the said fifteen months. In 1891, Edward Finley was divorced, at Chicago, from his wife, the mother of Minnie Finley, and she was given custody of the child, and he, under the law, freed from all legal obligations to support the child; the divorced mother of Minnie Finley placed the child at a Catholic educational institution at Chicago, and paid her board and tuition there for a while, when, it seems, she ceased paying, and. upon application of the authorities there, the father, Edward Finley, paid such board for a time; but several years ago, upon his ceasing to pay, the child was discharged from the institution. How she has been supported and cared for in the interval to this time does not appear, but certainly not by the father. It does not appear that any guardian of the estate of Minnie Finley was ever appointed anywhere, and it is quite sure there was none in South Carolina up to the time of the appointment of the plaintiff herein, which as such guardian now brings this action for an accounting

against said Edward Finley, as executor, etc., and for the recovery of said legacy for Minnie Finley.

"On November 4, 1893, Edward Finley filed an account in the probate court at Charleston, in which account said legacy is stated to be paid; and he was discharged as executor of his brother, Thomas Finley.

"As a matter of fact in the case, no part of this legacy has ever been paid to any duly appointed guardian of Minnie Finley—although under the terms of the will it has been payable with interest for some seven or eight years. But the claim of the defendant, Edward Finley, here is that he has paid out of the bulk of it for necessaries for her support and maintenance; and as against this action for the legacy, he sets up these alleged payments (amounting in all, it is alleged, to $969), both as an equitable defense and as a counter-claim; and seeks to have them set off against the legacy admittedly in his hands as executor of his brother's will.

"Stripped of extraneous matter, there are really but two questions which fall out for decision in this case.

"First: Did Edward Finley actually pay out the amounts set out in his answer for necessities for Minnie Finley?

"Second: If so, should they be legally or equitably set off against the legacy, as prayed for in the answer?

"It is a conceded proposition of law in the case that, after the divorce, Edward Finley was under no such legal obligation as that of a father to child to pay for necessaries for his infant daughter, Minnie Finley. It is denied, as a matter of fact, that the evidence is sufficient to establish the payments, or that, if established, they can be considered more than mere gratuities, induced by the natural tenderness and affection of a father to a child, the decree for divorce excusing him from any such legal obligation to the contrary notwithstanding. It is argued for defendant that the idea of gratuity is inconsistent and irreconcilable with the idea of misappropriation of the legacy."

The findings of fact and conclusions of law by the Circuit Judge are as follows:

"I have reached a conclusion, however, upon the facts of the case, after a careful examination of the pleadings and testimony, which lead me to the irresistible conclusion that this is no such case in which a court of equity should sanction any such actions as those of Edward Finley towards his infant daughter, Minnie Finley, whereby he has deprived her of her uncle's bounty entrusted to his hands for her benefit and unqualifiedly under the will for her with interest, fifteen months after the said testator's death. I do not think it is necessary even to attempt to reconcile the dilemma in which her attorneys are sought to be placed upon the argument (and I must say right here that this case has been most ably and completely argued before me, and in all respects presented so that I have had as little difficulty as possible in arriving at my conclusion). The testimony, viewed in the light of the intrinsic probabilities of the situation disclosed by the record, satisfies me that Edward Finley simply appropriated this legacy of his daughter, and converted it to his own use, and when demands were made upon him for necessaries which it was said her mother was unable to meet, he met those demands reluctantly out of his own funds, and to the least extent possible (either moved by those natural dictates of a parent for its offspring, which, as above stated, no decree for divorce, nor any other human agency, can eradicate altogether from the human breast; or to avoid bringing on legal inquiry and the consequent compulsion upon him to make a settlement with her and discharge the legacy). The payments he made for her at the Catholic academy and to the doctors and for clothing, if he made them to the extent claimed in his answer (and the testimony is very meager and unsatisfactory as to these alleged payments) were, in my opinion, paid by him gratuitously in the sense of the law, but more in the nature of expediency to keep his daughter from actual want and consequent more rigid inquiry on her behalf into her affairs. And he never had expressed the slightest

intention of making these payments a charge against the legacy. He, perhaps, intended to pay her the legacy when he saw fit; but he did not intend to and did not in the law or fact carry out the solemn sentence of his brother's will. He undertook to ignore and set at naught the directions of the most sacred instrument known to the law, a dead man's will —and yet he is here invoking the aid of a court of equity, which, through the humble instrumentality of its presiding Judge, is here charged by decisions of our Courts now hoary with age, coming down to us from Judges and Chancellors whose very names demand our reverence, admiration and respect, with the sacred duty of protecting the interests of those who, by reason of their tender years, cannot protect themselves.

"He was divorced from the mother and she given the custody and control of the child. It is manifest he did not intend the mother to get control of the legacy. See his letter to Dr. Smith, of August 4th, 1900, 'I know nothing would be more pleasing to her mother than to get her fingers on that money.'

"Now, it is no use to go over the cases from our State and elsewhere, which establish the principles of law controlling the situation here. There can be no doubt, from these cases, that while it is better practice for a guardian or trustee to get the sanction of the Court for the expenditure of any of the capital of the ward as *cestui que trust,* there may be exigencies which will require such a break in the capital before such sanction can be obtained, and which will at once be sanctioned when brought to the attention of the Court; and there may be cases even where there is no exigency, but the money has actually and in good faith been paid out for necessaries of the ward as *cestui que trust,* which a court of equity would ratify and allow to be set off in a suit subsequently brought by or on behalf of the ward or *cestui que trust.* All I can say here is that this does not appear to me as such a case. There does not seem to me to surround it and to characterize the actions of the executor here, who held this legacy as guar-

dian of his own wrong as trustee by operation of law, after
it became payable under the will, that apparent openness of
dealing and purpose to act for the best interest of the child
which recommends a case to the Court when such a defense
is interposed as we have here. The atmosphere here is one
of concealmnt and deceit. The excutor credits himslf in the
probate court with paying the legacy in full, when, as a mat-
ter of fact, he had not, even on his own showing, paid it
more than in part. There is no real pretense at an invest-
ment of the fund for the benefit of the child (unless the mere
juggling with the bank stock can be called such investment—
which it cannot) and the application of the income to her
needs and a break into the capital only upon clear proof of
necessity. The terms of the dead uncle's will were not com-
plied with, and yet the discharge as executor was deceitfully
obtained; the infant abandoned and for years no money paid
for her at all, or income credited to her. The doctor whose
services she seems to have required, deceived as to her ability
to pay his bill—no frank disclosure of the *status* of her legacy
in his hands—no systematic or any other sort of accounts
kept; and the bold claims set up here, years after the money
should have been paid or invested for her, that a large sum,
almost the whole capital of the legacy, was expended by him
for necessaries for her, and an appeal made to the conscience
of the Court in his behalf therefor.

"The plaintiff herein is entitled to the relief demanded in
the complaint, and the defense and counter-claim are neither
sustained. Let it be referred to master Mitchell to compute
the amount due under the will of Thomas Finley to the lega-
tee, Minnie Finley, pursuant to the conclusions herein an-
nounced, and report the same to this Court for its further
order and decree thereupon."

The appellant's attorneys in their argument say: "The sole
question in the case under the decision of the Judge is: Were
these payments made by Edward Finley, in the eye of the
law, such gratuituous payments, as that he is not entitled to
have the benefit of credit for the amounts so paid, in an ac-

counting with the plaintiff? This issue is further narrowed, in as much as the facts are not disputed and the question is: Did the Circuit Judge draw a correct legal conclusion from those facts?"

In *Riddle* v. *Riddle,* 5 Rich. Eq., 31, 34, it is said: "Whenever the father or other near relative of the infant is trustee, in such case he should show distinctly his purpose to charge for maintenance; or maintenance before such manifestation, may be justly inferred to be afforded gratuitously."

The case of *Crosby* v. *Crosby,* 1 S. C., 337, states the principle correctly, that when a father makes a gratuity to a child, he cannot afterwards convert it into a debt.

In the case of *Pressley* v. *Davis,* 7 Rich. Eq., 105, the following principle is announced: "If the father were now claiming for the past maintenance of his children, the claim would be rejected. A father is bound to maintain his infant children from his own estate, however ample may be their separate resources, and no allowance for this purpose will be made to him out of their estate. If he is unable to maintain them, the Court may order maintenance out of their own property, upon his petition for this purpose; the first point of inquiry being his ability to maintain them suitably from his own estate. But his past maintenance of them, creates no debt from them to him."

The appellant's attorneys, however, contend that, after the defendant was absolved from the legal obligation imposed upon him to support his infant daughter, they sustained towards each other the relation of strangers; and that when he, as executor, came into possession of the legacy bequeathed to her, he occupied no other attitude than that of her trustee. While it is true that the judgment in the divorce proceedings absolved him from all *legal* obligation to maintain her, nevertheless he still remained under a *moral* duty to render her assistance, which was not lessened by those proceedings. Indeed, when it was adjudged in a proceeding to which he was a party that he was no longer liable for her support, the moral obligation became greater, for the reason

that he took part in depriving her of her legal rights. The defendant invokes the aid of the Court in the exercise of its chancery powers, which it cannot grant without ignoring the moral obligation that rested upon him to support his infant daughter. He does not come into Court "with clean hands," and, therefore, is not in a position to ask for equitable relief. In making the expenditures for the maintenance of his daughter, the Court will presume that his intention was to discharge and not to violate his moral obligation, or, as said by the Circuit Judge, that he was "moved by those natural dictates of a parent for its offspring, which no decree of divorce nor any other human agency, can eradicate altogether from the human breast."

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.